**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**SHANE W. YOST,**

        **Plaintiff,**

**v.**                                      **Case No.: 1:15-cv-06828**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motion for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11, 12).

The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.    Procedural History

In the Fall of 2011, Plaintiff Shane W. Yost ("Claimant"), filed applications for SSI and DIB, alleging a disability onset date of January 1, 2011, (Tr. at 217, 222), due to "back pain and PTSD [post-traumatic stress disorder]." (Tr. at 241). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 20). Claimant filed a request for an administrative hearing, which was held on November 7, 2013 before the Honorable Joseph Scruton, Administrative Law Judge ("ALJ"). (Tr. at 34-65). By written decision dated January 29, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 20-29). The ALJ's decision became the final decision of the Commissioner on April 23, 2015, when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a brief in support of the complaint, (ECF No. 10); the Commissioner subsequently filed a brief in support of the decision of nondisability, (ECF No. 11); and Claimant filed a reply memorandum. (ECF No. 12). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 36 years old on the alleged disability onset date, and 39 years old on the date of the ALJ's decision. (Tr. at 28). Claimant has a post-graduate education, having earned a Master's Degree, and communicates in English. (Tr. at 36, 390). Claimant's prior

relevant work experience includes positions as a child protective services worker for the State of West Virginia and as a substitute teacher.   (Tr. at 242).

## III.   __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the

impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 22, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2011, the alleged disability onset date. (Tr. at 22, Finding No. 2). Claimant had worked since January 2011 as a substitute teacher, but this work did not rise to the level of substantial gainful activity. At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "mild degenerative disc disease of the thoracic spine, mild generalized osteoarthritis, hypertension, recent manifestation of left shoulder tendonitis, PTSD, and an anxiety

disorder." (Tr. at 22-23, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 23-24, Finding No. 4). Accordingly, he determined that Claimant possessed:

> [T]he residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except due to mental health issues, partially resolved with medication regimen and treatment, the claimant is able to fulfill no more than short simple instructions but is able to respond appropriately to supervisors, others, and to deal with routine work changes.

(Tr. at 24-27, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 27, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 28, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1974, and was defined as a younger individual age 18-44; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2 (the "Grids"), supported a finding of "not disabled" regardless of his transferable job skills. (Tr. at 28, Finding Nos. 7-9). Given these factors and Claimant's RFC, the ALJ applied the Grids and concluded that Claimant was not disabled. (Tr. at 28, Finding Nos. 10, 11).

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant argues that the ALJ's decision is not supported by substantial evidence for a number of reasons. First, he contends that the ALJ applied incorrect legal standards

in evaluating Claimant's pain and in weighing the opinions of his treating physician, Dr. Joseph Ascue. In regard to his pain, Claimant contends that the ALJ discounted Claimant's statements regarding the severity of his pain solely because the ALJ found "no objective basis" for Claimant's pain. (ECF No. 10 at 7). According to Claimant, the ALJ should have assessed the credibility of his statements using the two-step process mandated by Social Security regulations and rulings, which in contrast to the analysis performed by the ALJ, does not require objective evidence of pain to corroborate the veracity of a claimant's statements regarding its severity, persistence, and limiting effects. With respect to the opinions of his treating physician, Claimant focuses on a comment by the ALJ that the opinions of treating providers are entitled to "appropriate consideration" when they are well-supported and consistent with the clinical evidence. Claimant asserts that the ALJ misstated the correct legal standard, which requires the well-supported opinions of treating sources to be given *controlling* weight, not merely "appropriate consideration." (*Id.* at 8).

Second, Claimant alleges that the ALJ erred in assessing Claimant's mental impairments when the ALJ found that the opinions of Claimant's treating counselor, Ms. Bishop, were not entitled to "much weight," because she was not a psychiatrist or psychologist. (*Id.* at 9). Claimant argues that, given her role in Claimant's mental health treatment, Ms. Bishop's opinions should have been evaluated using the same criteria employed to weigh the opinions of any acceptable medical source. Claimant also criticizes the ALJ's statement that Ms. Bishop's opinions were inconsistent with her treatment notes. Claimant emphasizes that only summaries of his treatment were provided to the ALJ; therefore, no treatment notes appear in evidence. If the ALJ meant the summaries when he referenced "treatment notes," then, Claimant argues, the ALJ should have

specified what particular portions of the summaries were inconsistent with Ms. Bishop's opinions. By failing to do so, the ALJ's rationale was "basically nonreviewable." (*Id.*).

Next, Claimant is highly critical of the RFC findings made by the ALJ, indicating that the ALJ failed to supply any explanation for how he arrived at the sedentary exertional level and the mental limitation in the RFC finding. (ECF No. 10 at 10-11). Claimant contends that the ALJ provided no medical justification for determining that he could perform a full range of sedentary work, and never supplied any insight into the evidentiary basis for restricting Claimant to short, simple instructions.

Finally, Claimant attacks the ALJ's limited use of the vocational expert and his application of the Grids to direct a finding of nondisability. (*Id.* at 11-12). Claimant emphasizes that the ALJ found both exertional and nonexertional limitations in Claimant's RFC. Yet, rather than using the available vocational expert to determine the existence of jobs, if any, in the national and regional economy that could be performed by Claimant, the ALJ improperly applied the Grids. Claimant argues that the ALJ was obligated under this Circuit's legal precedent to obtain opinions from the vocational expert regarding specific jobs available to Claimant in light of his individual RFC, age, and work experience.

In response, the Commissioner disagrees with Claimant's characterization of the ALJ's discussion, asserting that the ALJ properly applied the law to the facts and reached a decision that was supported by substantial evidence. (ECF No. 11 at 5-8). The Commissioner also takes the positon that the ALJ's decision to use the Grids in place of a vocational expert was proper in light of Claimant's RFC. (*Id.* at 8-9). According to the Commissioner, in limited circumstances, an ALJ is permitted to rely on the Grids even when a claimant has both exertional and nonexertional restrictions. The Commissioner

argues that when the nonexertional restrictions have very little effect on the occupational base at the applicable exertional level, then the Grids may be used because the conclusion directed would not be affected by the nonexertional limitations. The Commissioner adds that Claimant's nonexertional limitation, which resulted from his mental impairments, restricted him to simple unskilled work. Given that the Grids only contemplate unskilled work, Claimant's nonexertional limitation did not significantly erode the occupational base, making the Grids an applicable and appropriate tool for determining whether Claimant was disabled under the Social Security Act.

V.  **Relevant Medical Evidence**

   **A.  Treatment Records**

On November 10 and 17, 2010, Claimant underwent a self-referred psychological evaluation performed by Theresa L. Bishop, M.S., for the purpose of determining his counseling needs. (Tr. at 309-15). Ms. Bishop was a licensed professional counselor and a supervised psychologist who worked in conjunction with L. Andrew Steward, Ph.D., a licensed psychologist. (Tr. at 315). Ms. Bishop interviewed and observed Claimant and administered a Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") and a Millon Clinical Multiaxial Inventory-III ("MCMI-III").

Ms. Bishop noted that Claimant appeared adequately dressed and groomed on the first day of the evaluation. He was appropriately talkative and was diligent in completing the testing. (Tr. at 309). Claimant reported that he was married, living with his wife and three children in Virginia. He had obtained a Master's Degree in criminology from Troy University in Alabama. Claimant was employed with the West Virginia Division of Juvenile Services, and had worked with that agency since 2008. (Tr. at 310). Prior to 2008, he worked for the Mercer County Department of Health and Human Resources, at

Southern Highlands, and at Pressley Ridge.

With respect to his psychological symptoms, Claimant stated that he felt anxious "a great deal of the time." (*Id.*). He worried about his children and child care, his job, his parents' divorce, and the responsibility of caring for his mother. Claimant complained of a lack of energy, feeling depressed, and of having nightmares related to child abuse investigations. He also expressed a feeling of helplessness over his work and financial situation. He felt guilty for leaving Child Protective Services and questioned whether he had actually helped anyone. However, Claimant did not have problems being around children, crowds, or noises, and he denied feeling angry or violent.

Claimant denied a history of psychiatric hospitalization or counseling and further denied any history of abuse as a child. Claimant did not take any medications, but did occasionally drink alcohol. He indicated that he did not have many hobbies, but spent a great deal of time taking care of his children. He had some friends and visited regularly with his grandparents and mother. He did not belong to any clubs or attend a church, but he reported a fair amount of interest in people and things. Claimant and his wife of eleven years, Melissa, had a good relationship. Claimant complained that his parents had put him in the middle of many arguments in the past, but they were now divorced, and he had a relationship with both of them. His mother lived closer and spent more time at his house, however, making him feel that she was too dependent on him. (Tr. at 311).

Ms. Bishop documented the results of Claimant's testing, which suggested the presence of depression and psychopathic deviance. (Tr. at 312). After explaining the characteristics of individuals who had scores similar to Claimant, Ms. Bishop concluded that Claimant's testing indicated a generalized anxiety disorder. She assessed Claimant with Depressive Disorder, not otherwise specified ("NOS"); Anxiety Disorder, NOS; and

PTSD. (ECF No. 314). Ms. Bishop scored Claimant at 65 on the Global Assessment of Functioning Scale.[1] She recommended that Claimant participate in individual counseling to address anxiety, depression, and PTSD, and also consider family counseling. Ms. Bishop felt Claimant might benefit from the use of psychotropic medications prescribed through his family physician or a psychiatrist. She felt Claimant's prognosis with treatment was fair. (Tr. at 315).

Claimant presented to the office of his family physician, Dr. Joseph Ascue, on February 1, 2012 complaining of mid back pain, anxiety, and panic attacks. (Tr. at 361). He reported a work-related injury, losing his health insurance, and seeing a counselor for PTSD. Claimant stated that he became phobic in public, would hyperventilate, and get anxious. He denied suicidal or homicidal thoughts. Dr. Ascue diagnosed Claimant with anxiety, PTSD, and chronic low back pain. He told Claimant to return in three months. (*Id.*).

On March 21, 2012, Claimant met with Ms. Bishop for a diagnostic interview. (Tr. at 368-71). Claimant updated his history by advising Ms. Bishop that he now worked part-time as a substitute teacher. He stated that he wanted to work full-time, but was physically unable to do so. (Tr. at 368). Claimant reported feeling frustrated and anxious over having chronic pain. (Tr. at 369). He also reported having flashbacks, negative memories, and nightmares related to his previous job.  He worried about finances and had poor sleep

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. In the past, this tool was regularly used by mental health professionals; however, in the latest edition of the DSM (DSM-5), the GAF scale was abandoned, in part, due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. A GAF score between 61-70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

habits. Claimant stated that he took Ativan for panic attacks, but took no other medications. He had never been hospitalized for psychiatric illness. Claimant described getting along well with his wife, children, and parents, although his mother's dependence on him was a stressor. Claimant indicated that he liked to read, go to the library, help with his son's wrestling team, cook, walk the dog, and occasionally visit with friends. (Tr. at 370). Ms. Bishop diagnosed Claimant with Anxiety Disorder, NOS, and PTSD. His GAF score was 65. She recommended individual counseling and psychotropic medication. (*Id*).

On July 3, 2012, Claimant saw Dr. Ascue for worsening panic attacks while on Ativan, with longer recovery periods. (Tr. at 360). Dr. Ascue decided to discontinue Ativan and try Claimant on a different medication. He diagnosed Claimant with anxiety/panic attacks and chronic low back pain. He told Claimant to return in 30 days. (*Id.*).

On August 1, 2012, Claimant presented to Dr. Ascue's office to follow-up on medical imaging taken of his back. (Tr. at 355). In particular, Claimant had an MRI of his lumbar spine performed on July 21, 2012, that was interpreted by Dr. Jaime Salvatore as showing "no significant disc bulge, canal, or foraminal stenosis." (Tr. at 357). A lumbar spine series read by Dr. Brian Antoun was described as a "normal study." (Tr. at 358). Dr. Ascue documented that he had reviewed these reports and was not sure what else to do for Claimant. (Tr. at 355). Accordingly, Dr. Ascue referred Claimant to Dr. Kropac, an orthopedist. (*Id.*).

On September 6, 2012, Claimant presented to the office of Robert Kropac, M.D., of Orthopaedic Center of the Virginias, for a consultation and evaluation. (Tr. at 327-30). Claimant complained of back pain in the thoracolumbar area, which had been present for several years. (Tr. at 327). He reported having x-rays taken of his back approximately five years earlier and receiving manipulative therapy from Dr. Williams for a period of one to

12

one and half years. Claimant stated that this treatment made his pain worse. In June 2012, Claimant had an MRI performed on his back and was seen by Dr. Ascue, but had not received any treatment. Claimant described his current back pain as constant, worsening with activities, and occasionally associated with a tingling sensation in both lower extremities. (Tr. at 328).

Claimant reported his past medical history as including a diagnosis of PTSD, seasonal allergies, and a tonsillectomy. He took Xanax prescribed by Dr. Ascue. (Tr. at 328). A review of systems was negative with the exception of back pain. Dr. Kropac performed a physical examination, documenting that Claimant appeared in no acute distress, and was well-developed and well-nourished. He noted that Claimant had a visibly increased kyphosis of the axial skeleton, but no evidence of significant scoliosis. Claimant had tenderness on palpation from T6 through L3. His range of motion was full, but was associated with pain. Claimant had no tenderness below the L3, and no sciatic notch tenderness. Straight leg-raising was negative on both sides. His joints showed a full range of motion, pulses were equal bilaterally, and sensation was grossly intact. (Tr. at 329). Claimant showed no signs of muscle atrophy or leg length discrepancy. He could heel and toe walk, and his gait was normal. A report of an MRI of the lumbosacral spine was reviewed, which showed no significant findings. (Tr. at 330, 341). X-rays taken in July 2012 were likewise unremarkable. (Tr. at 340).

Dr. Kropac diagnosed Claimant with thoracolumbar musculoligamentous strain rule out cord syrinx.[2]  Dr. Kropac planned to order an MRI of Claimant's thoracic spine

---

[2] A syrinx is a cyst on the spinal cord comprised of cerebrospinal fluid. *See* "Syringomyelia Fact Sheet", NIH Publication No. 10-3780 National Institute of Neurological Disorders and Stroke, National Institutes of Health, Bethesda, MD 20892.

for diagnostic purposes and prescribed Ultram for pain control. He advised Claimant to return following the MRI. (*Id.*).

Claimant saw Dr. Ascue on September 19, 2012 for a refill of Xanax. (Tr. at 352). He reported that his panic attacks were "much decreased." He also mentioned that he was seeing an orthopedist for his spine and was receiving Ultram for pain. (*Id.*) Claimant was diagnosed with anxiety/panic attacks and chronic back pain. He was told to return in six months, or sooner, if needed.

Claimant returned to Dr. Kropac's office on October 2, 2012. (Tr. at 325-26). Claimant reported that he had not been able to get his MRI completed yet, but planned on doing so. His back condition remained the same. (Tr. at 325). The pain was aggravated with motion, bending, stooping, twisting, but also with sitting, standing, or even lying down too long. He complained of a tingling sensation, as well. On examination, Dr. Kropac noted no significant changes. (Tr. at 325-36). Claimant was told to get the MRI and to return afterward.

Claimant returned to Dr. Kropac on October 18, 2012. (Tr. at 323-24). He had completed the MRI, and Dr. Kropac reviewed the report. (Tr. at 323). The report showed a mass at the T8-T9 level posteriorly that measured 17mm x 8mm x 5mm, located slightly to the right of the midline, mildly indenting the thecal sac but not touching the spinal cord. (Tr. at 323, 336). The report provided no information regarding the origin or diagnosis of the mass. Dr. Kropac's physical examination of Claimant yielded stable findings; however, he felt that Claimant should be referred to Dr. Jeffrey Greenberg, a neurosurgeon, for evaluation and treatment of the thoracic mass. Dr. Kropac copied Dr. Ascue on the office note.

Dr. Ascue sent Claimant to Bluefield Regional Medical Center on October 29, 2012

to have a CT scan of the chest and abdomen in light of the mass found on Claimant's thoracic spine. (Tr. at 332). Dr. Basim Antoun, the radiologist interpreting the CT scan, found nothing remarkable in Claimant's lungs. Dr. Antoun identified a right-sided epidural calcification at the level of the T8-T9, which correlated with the thoracic mass seen on MRI, but otherwise saw nothing suspicious. Dr. Antoun was uncertain of the clinical significance of the calcification. (*Id.*).

On November 5, 2012, Claimant saw Dr. Jeffrey Greenberg for a neurosurgical consultation. (Tr. at 384-86). Claimant described a five-year history of back pain that first began when he was in training as a correctional officer. He had an acute onset of right-sided hip pain and some leg pain. The pain eventually centered up his back between the scapulae and somewhat below and was always present. Claimant also reported a history of panic attacks and PTSD, for which he was prescribed Xanax. (Tr. at 384). Dr. Greenberg performed an examination that was entirely normal, except for some dysesthesia around the T8-T9. (Tr. at 385). He reviewed the MRI of Claimant's thoracic spine, observing the T8/T9 lesion, but indicated that it did not touch the cord and showed no surrounding edema. Other films looked normal. Dr. Greenberg suggested that there were two schools of thought regarding the lesion. First, the lesion could be surgically removed, with the hope that its absence would eliminate Claimant's pain symptoms. Second, the lesion could simply be watched radiographically over time to see if it changed or grew in any way. If it did grow, then surgery would be indicated. Dr. Greenberg felt the best option at that time was to get a second neurosurgery opinion and make a decision afterward. (*Id.*).

Accordingly, Claimant was evaluated by Dr. John R. Orphanos, of Neurological Associates, on January 15, 2013. (Tr. at 343-48). Dr. Orphanos indicated that Claimant was being seen in consultation for evaluation of a calcified epidural lesion at the T8-T9.

15

(Tr. at 343).  Claimant reported a five-year history of back pain that started between his shoulder blades and progressed down his back. The pain lessened with icing and with pain medication. Claimant also provided a history of anxiety disorder, cervical neck pain, mid thoracic back pain, low lumbar pain, and depression. A review of systems also elicited complaints of intermittent numbness and tingling in the right hip, weakness in the low back, and decreased range of motion. (Tr. at 344).

Dr. Orphanos performed a physical examination of Claimant. (*Id.*). Claimant's blood pressure was elevated and his weight was documented at 252 pounds. However, he was in no acute distress and appeared alert and oriented. Claimant's gait and station were observed to be normal with good tandem. His pulses were also normal. Claimant's neck examination was unremarkable with normal range of motion, normal tone and stability, and no evidence of swelling, tenderness, and misalignment. (Tr. at 345). Inspection of Claimant's spine revealed diffuse back pain, but had normal range of motion, stability, muscle strength, and tone. Claimant's upper and lower extremities were likewise stable, with a full range of motion, 5/5 strength/tone, and no evidence of misalignment, swelling, redness, or tenderness. (Tr. at 345-46). Straight leg-raising was negative. (Tr. at 346). Claimant's coordination was intact; his deep tendon reflexes were 2+ in all extremities; he had no pathologic reflexes; and his sensation was intact to pinprick and light touch.

Dr. Orphanos reviewed Claimant's thoracic MRI and noted the lesion at T8-9. (Tr. at 347). He commented that a follow-up CT scan of the thoracic area indicated that the lesion was likely an area of calcified ligamentum flavum at T8-T9, without any appreciable spinal cord compression. Dr. Orphanos diagnosed Claimant with lumbago. He stated that Claimant's neurological examination was perfectly normal; accordingly, Dr. Orphanos did not believe that the lesion was causing any symptoms. (*Id.*). He recommended that

Claimant have a follow-up film in a year or so, but as long as the lesion stayed the same size, no intervention would be required.

Claimant saw Dr. Ascue on March 26, 2013 for medication refills. (Tr. at 396). He was diagnosed with anxiety, panic attacks, and chronic back pain. Dr. Ascue noted that Claimant had lost 18 pounds, down from 250 pounds. He was told to return in six months, or earlier is needed. Claimant returned in April and May with sinus-related symptoms. (Tr. at 394-95). In May, Claimant also complained that his back pain was worse, and he had pain in his hips and numbness in his legs. (Tr. at 394). Dr. Ascue diagnosed Claimant with persistent otitis and prescribed an antibiotic.

On June 27, 2013, Claimant saw Dr. Ascue with depression. On examination, Dr. Ascue found Claimant to have tenderness at the right lateral back from L3-S1. (Tr. at 392). He diagnosed Claimant with chronic back pain, depression, and anxiety. Dr. Ascue prescribed Percocet for Claimant. (Tr. at 393). Claimant returned on September 20, 2013 for a refill of Xanax. (Tr. at 391). His diagnoses remained the same, and he was told to return as needed.

On October 22, 2013, Claimant saw Dr. Ascue for medication refills. (Tr. at 390). Claimant reported that he was scheduled to have two MRI films performed. He was told to return after the tests were performed. An MRI of his left shoulder was performed on October 26, 2013 for symptoms of pain and decreased range of motion. (Tr. at 401). The study was interpreted as showing a sliver of fluid surrounding the biceps tendon suggesting tendonitis, mild sub coracoid bursitis, and supraspinatus tendinosis. (*Id.*).

### B. Disability-Related Reports and RFC Assessments

On December 27, 2011, Claimant was examined by Dr. William Humphries at the request of the Virginia Department of Rehabilitative Services. (Tr. at 317-20). Dr.

Humphries documented Claimant's chief medical condition to be "low back pain." (Tr. at 317). Claimant stated that the pain began approximately four years earlier with some excess physical activity. It began in the mid back and spread to the lower back. The pain increased with bending and lifting and was worse with prolonged standing and walking. Claimant retained bowel, bladder, and extremity control. He denied having surgery or injections, but had sought chiropractic care, which revealed the malalignment of a disc and some arthritis.

A review of systems elicited no other contributory information, except Claimant reported losing fifty pounds in the last six months on the Weight Watchers program. (*Id.*). On physical examination, Claimant was 5'11" tall, weighed 244 pounds, and had an elevated blood pressure. (Tr. at 318). He was not noted to be in any acute distress. Claimant's mental status was normal, and he was cooperative. Range of motion of Claimant's neck was mildly reduced, as was the range of motion of his back. Straight leg-raising was negative, and his joint range of motion was normal. Dr. Humphries observed that Claimant moved on and off the examining table slowly. Claimant also declined to move into supine position for fear that he would develop back spasms that would incapacitate him. Claimant's gait was normal, however, and he could briefly heel and toe walk. Tandem gait was adequate. Claimant's grip strength, nerve function, and fine manipulation were all normal. (Tr. at 318-19). The remainder of the examination was unremarkable.

Dr. Humphries diagnosed Claimant with diastolic hypertension, chronic thoracolumbar strain with probable degenerative disc disease and degenerative joint disease of the thoracolumbar spine, and mild degenerative joint disease of both feet and the third fingers of both hands. (Tr. at 319). Dr. Humphries opined that Claimant would

18

be limited to sitting six hours in an eight-hour workday; to standing and walking six hours in an eight-hour workday, and to lifting 50 pounds occasionally and 25 pounds frequently. He believed that Claimant could only occasionally climb, kneel, and crawl, but had no restrictions on stooping or crouching, and no environmental limitations. (Tr. at 319-20).

On December 31, 2012, Dr. Ascue completed a Residual Functional Capacity Questionnaire for Claimant. (Tr. at 363-64). He stated that he had acted as Claimant's family physician for ten months and had treated Claimant for chronic low back pain, anxiety, and PTSD. (Tr. at 363). Dr. Ascue described Claimant's conditions as "stable," but added that he doubted Claimant would get better. He felt Claimant's symptoms of low back pain would frequently interfere with the attention and concentration required to perform simple work-related tasks. Dr. Ascue indicated that Claimant experienced the side effects of dizziness and drowsiness from his medications, and he would require breaks in excess of those normally permitted in the average eight-hour workday. Dr. Ascue opined that Claimant could sit thirty minutes and stand/walk twenty minutes at one time; could sit a total of six hours in an eight-hour day; could stand/walk a total of three hours in an eight-hour day; would need to shift positions throughout the day; and would need to take unscheduled breaks. (*Id.*). In addition, Dr. Ascue felt that Claimant could frequently lift and carry up to ten pounds, occasionally lift and carry twenty pounds, but could never lift and carry fifty pounds. (Tr. at 364). He did not believe Claimant had any limitations related to repetitive reaching, handling, fingering, grasping, twisting or turning his hands, fine manipulation, and reaching. Dr. Ascue did not think Claimant was a malingerer. He estimated that Claimant would need more than four days per month off from work due to his impairments and opined that Claimant was not physically capable of working full-time on a sustained basis. (*Id.*)

On January 10, 2013 and October 9, 2013, Ms. Bishop supplied summaries of Claimant's psychological evaluations and care to Claimant's disability representative. (Tr. at 366-67, 373-74). She provided his diagnoses of Depressive Disorder, NOS; Anxiety Disorder, NOS; and PTSD. She indicated that Claimant had attended individual counseling sessions one time in 2010, twelve times in 2012, and twelve times in 2013 to date. (Tr. at 373). According to Ms. Bishop, Claimant kept a log of his panic attacks to help identify the triggers and had managed a decrease in the number of attacks in 2012; however, they still posed a significant hurdle in his everyday life. (Tr. at 367). In 2013, he reported having two to four panic attacks per month, which were triggered by changes in routine, family problems, financial strain, PTSD, and difficulty dealing with increased pain. (Tr. at 374). In addition, Ms. Bishop reported that Claimant continued to suffer from anxiety and depression. (*Id.*).

Ms. Bishop completed a Mental Capacity Assessment form for Claimant on October 9, 2013. (Tr. at 377-79). She stated that Claimant had no limitation in remembering locations and work-like procedures, a slight limitation in understanding and remembering short and simple instructions, and a moderate limitation in his ability to understand and remember detailed instructions. (Tr. at 377). Ms. Bishop explained that Claimant complained of difficulty concentrating and focusing due to his anxiety and chronic pain. Ms. Bishop did not believe Claimant was limited in his ability to carry out short and simple instructions, but was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, and performing tasks on a schedule with regular attendance. She thought he would be slightly limited in his ability to sustain an ordinary routine without special supervision, noting that Claimant had increased panic attacks when in situations requiring him to complete

20

tasks. His inability to maintain his responsibilities led to depression, with resulting loss of sleep and low energy. These problems, when combined with his difficulty maintaining attention and his chronic pain, exacerbated his feelings of anxiety. Accordingly, Ms. Bishop opined that Claimant had marked limitations in his ability to work in proximity with others without being distracted. She also felt he had marked deficits in the ability to perform at a consistent pace and complete a normal workweek without interruptions from psychologically based symptoms. (Tr. at 378). Ms. Bishop assessed Claimant's ability to make simple work-related decisions as moderately limited and his ability to complete a normal workday without interruptions from psychologically based symptoms to be moderately impaired. She expected he would need four or more days off in an average month due to his symptoms. According to Ms. Bishop, Claimant's chronic pain, anxiety, and depression caused him to become frustrated and irritable, making him unable to tolerate the stresses of work.

With respect to social interaction, Ms. Bishop believed Claimant was slightly impaired in his ability to request assistance, ask questions, act appropriately, and adhere to basic standards of neatness. (Tr. at 378). She felt he was moderately limited in his ability to interact with the general public, accept instructions and criticism, and get along with co-workers without distracting them or exhibiting behavioral extremes. Ms. Bishop explained that Claimant had difficulty in social situations, experiencing a great deal of anxiety in public settings. He had panic attacks when interacting with others and also was irritable due to his chronic pain. (*Id.*). Ms. Bishop opined that Claimant's limitations in the area of adaption were minor, except he did have a moderate limitation in his ability to respond appropriately to changes in the work setting. She stated that changes caused Claimant to have panic attacks. (Tr. at 379).

On December 18, 2013, the U.S. Department of Education approved Claimant's total and permanent disability discharge application, requesting discharge of two student loans he had obtained in 2003. (Tr. at 404). The total amount forgiven was $20,826. Claimant was notified that his employment earnings would be monitored for three years to insure that they did not exceed a certain amount. If his earnings did exceed the specified amount in the three-year post-discharge period, Claimant's loan would be reinstated. (*Id.*).

On March 5, 2014, Ms. Bishop wrote a letter in support of Claimant's disability appeal. (Tr. at 402-03). Ms. Bishop indicated that she had been counseling Claimant since March 2012. During that time, he had made some progress; however, she felt his ability to maintain consistent functioning in daily activities had deteriorated. Ms. Bishop set out Claimant's reports of difficulty with memory and concentration, his feelings of frustration, and his increased anxiety and depression at being unable to maintain gainful employment. (Tr. at 403). She stated that Claimant also complained of having nightmares when interacting with acquaintances and previous co-workers and attempted to avoid contact with any triggers of his PTSD symptoms. Ms. Bishop believed Claimant's anxiety, panic attacks, and PTSD prevented him from returning to his prior employment and would likely interfere with his ability to perform any job position. (*Id.*).

## VI.   <u>**Standard of Review**</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

Claimant's criticisms of the Commissioner's decision can be group into three categories: (1) errors affecting the physical RFC finding; (2) errors affecting the mental RFC finding; and (2) errors affecting the step 5 finding. After a summary of the relevant legal principles, each category will be addressed in turn.

### A.  Relevant Law

#### 1. RFC

Between the third and fourth steps of the sequential disability process, the ALJ determines the claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a

measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential process to determine whether the claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to SSR 96-8p, the ALJ arrives at a claimant's RFC by conducting "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set

forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

### 2. Opinions from Acceptable Medical Sources

The ALJ "must always consider and address medical source opinions" in assessing the claimant's RFC. SSR 96-8p, 1996 WL 374184, at *7. As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of acceptable medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). Nevertheless, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is

25

inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996).

In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability": including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

### 3.  *Opinions from Other Medical Sources*

The Commissioner may also use evidence from other sources, such as chiropractors and counselors, "to show the severity of the individual's impairment(s) and

how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. 2006); *see also* 20 C.F.R. §§ 404.1513(d), 416.913(d). Social Security Ruling 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources, and from non-medical sources, should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not "acceptable medical sources," but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time.

2006 WL 2329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the

consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *Id.* at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6. However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Pack v. Colvin*, No. 2:13-25249, 2014 WL 6607019, at *20-*21 (S.D.W.Va. Nov. 19, 2014). The Ruling requires the ALJ to apply a common sense standard. For example, in an atypical case, when an "other source" opinion is given more weight than a "treating physician" opinion, and the decision is not fully favorable to the claimant, the ALJ **must** explain the reasons for the weight given to the two opinions. SSR 06-03P, 2006 WL 2329939, at *6. On the other hand, the Ruling implicitly allows the ALJ leeway not to discuss an opinion from an "other source" that is duplicative or cumulative

of opinions already addressed in the decision, that is tangential to the outcome, or that is integrated or adopted in another opinion explicitly weighed by the ALJ. *See, e.g., Love-Moore v. Colvin,* No. 7:12–CV–104–D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (holding that "the language in SSR 06–03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory.") This interpretation of the Ruling is consistent with the general principle that although the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F. Supp. 2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-CV-20, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

### 4. Credibility Analysis

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL

374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides additional direction on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the

determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

### B. Errors Affecting the Physical RFC Finding

Claimant contests the ALJ's finding that he is capable of doing sedentary exertional work. Claimant contends that the ALJ applied an incorrect legal standard when weighing Dr. Ascue's RFC assessment, which provided that Claimant was incapable of working a full-time job. Claimant argues that the ALJ essentially rejected ***all*** of the medical source opinions and ultimately "devised" an RFC finding that "was a product of his own inexpert imagination and [was] actually inconsistent with both the medical evidence and the weight he accorded same." (ECF No. 10 at 6). In addition, Claimant accuses the ALJ of using the wrong legal standard in evaluating Claimant's credibility, improperly rejecting Claimant's allegations of severe pain solely because Claimant lacked objective proof of the pain.

In the RFC finding, the ALJ determined that Claimant could perform a full range of sedentary work with one nonexertional restriction related to his mental impairments;

that being, that Claimant was "able to fulfill no more than short simple instructions but is able to respond appropriately to supervisors, others, and to deal with routine work changes." (Tr. at 24). To arrive at this RFC, the ALJ weighed the opinions of the acceptable medical sources and Ms. Bishop, assessed Claimant's credibility, and examined other evidence including the medical records, Claimant's function reports, and Claimant's wife's written statement. With respect to Dr. Ascue's opinions, the ALJ reviewed the functional assessment prepared by Dr. Ascue on December 31, 2012. (Tr. at 26). The ALJ took note that Dr. Ascue believed Claimant could lift and carry up to 20 pounds, could sit up to six hours in an eight-hour workday, and could stand or walk up to three hours per eight-hour workday. In addition, the ALJ acknowledged Dr. Ascue's opinions that Claimant's back pain would interfere with his attention and concentration; that it would require Claimant to take more than four absences per month; and it would likely prevent Claimant from working a full eight hours per day, five days per week. (*Id.*). After reviewing these opinions, the ALJ gave them "very limited weight" on the basis that Dr. Ascue provided no "objective medical reason for why the claimant is so limited." (Tr. at 27). At the same time, the ALJ pointed out that Dr. Ascue's estimates of Claimant's exertional capabilities were at least consistent with Claimant having the functional capacity to perform sedentary work. Ultimately, the ALJ determined that Claimant could perform occupations at the sedentary exertional level. (*Id.*).

Although the ALJ's explanation for the weight he gave Dr. Ascue's opinions certainly could have been more robust, his failure to provide additional detail does not constitute a ground for remand, because the ALJ gave a good reason for not accepting the more extreme limitations described by Dr. Ascue in the RFC assessment form. Moreover, the evidentiary support underlying the ALJ's rejection of Dr. Ascue's opinions is clear

when viewing the ALJ's complete RFC discussion.

Just prior to reviewing and weighing Dr. Ascue's opinions, the ALJ reviewed Claimant's treatment records, emphasizing that Claimant's physical and neurological examinations were generally within normal limits. (Tr. at 25). Furthermore, the ALJ noted that Claimant's "objective diagnostic testing [had] not shown severe spinal conditions": and his neurosurgeons had found no causal connection between his alleged pain and the single abnormal finding observed on his multiple examinations; namely, the T8-T9 calcified lesion. (*Id.*). Considering the absence of any objective physical condition that could explain Claimant's pain, the lack of clinical findings consistent with a chronic pain disorder, and the extent of Claimant's activities as outlined in his function reports and as described to his care providers, the ALJ found Claimant's complaints of disabling pain to be uncorroborated. Consequently, the ALJ concluded that Dr. Ascue's more extreme opinions, which were based entirely on Claimant's allegations of disabling pain, were not well-supported. Thus, the record contains persuasive evidence to the contrary of Dr. Ascue's opinions, which was a valid reason for the ALJ to reject them.

Nonetheless, the ALJ recognized that, from a purely exertional perspective, Dr. Ascue's opinions regarding the maximum weight Claimant could lift and carry, and the amount of time in an eight-hour workday he could sit, stand, and walk, allowed Claimant to perform jobs at the sedentary level. Indeed, the regulations define sedentary exertional work as that which:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a). The ALJ essentially adopted these opinions inasmuch as he restricted Claimant to sedentary work. Therefore, to that extent, Dr. Ascue's opinions and the RFC finding were consistent. As for Dr. Ascue's statement that Claimant was not physically capable of working a full-time job (in other words, he was disabled from full-time employment), the ALJ was not required to give that opinion any particular deference. A statement about whether a claimant is disabled constitutes an opinion on an issue reserved for the Commissioner and, thus, is not entitled to special significance.[3] Accordingly, when viewing the ALJ's treatment of Dr. Ascue's opinions as a whole, the undersigned **FINDS** that the ALJ did not err in how he weighed the opinions.

As a related criticism, Claimant argues that the ALJ created the RFC finding out of whole cloth, indicating that it was inconsistent with the medical evidence and the medical source statements. In terms of the physical RFC finding, Claimant contends that the ALJ's determination that Claimant could do sedentary work was "in direct opposition" to Dr. Humphries' conclusion that Claimant could do medium exertional work. Furthermore, Claimant suggests that the ALJ intentionally omitted from consideration the RFC assessments provided by the non-examining agency consultants, who also determined that Claimant could do medium level work.[4] (ECF No. 10 at 5). A review of the written decision reveals that Claimant's perception of the ALJ's analysis is not entirely accurate. While it is true that the ALJ did not provide much discussion regarding the opinions of

---

[3] The undersigned also rejects Claimant's contention that the ALJ weighed Dr. Ascue's opinion using an incorrect legal standard. The ALJ clearly understood the governing standard, as he specifically cited to SSR 96-2p when describing how to appropriately consider a treating source opinion. SSR 96-2p is entitled "Giving Controlling Weight to Treating Source Medical Opinions." 1996 WL 374188 (S.S.A. 1996).

[4] Non-examining agency consultants, Bert Spetzler, M.D. and John Sadler, M.D., agreed that Claimant was capable of performing medium level exertional work with some nonexertional limitations. (Tr. at 91, 111-12). Two additional non-examining agency consultants, Howard Leizer, Ph.D. and Joseph Leizer, Ph.D., determined that Claimant's mental impairments were non-severe. (Tr. at 98, 121).

the non-examining agency consultants, he did, in fact, consider their statements. The ALJ noted that the non-examining consultants found Claimant to have the necessary mental and physical RFC to perform work, and these were opinions with which the ALJ essentially agreed. Nevertheless, he felt that the medical evidence received **after** the non-examining consultants provided their evaluations supported a conclusion "that claimant would be unable to perform medium work." (Tr. at 26).

Separate from his discussion about the non-examining consultants, the ALJ considered the opinions of Dr. Humphries, who performed an examination of Claimant. The ALJ gave Dr. Humphries' opinions little weight, again expressing his disagreement with the finding that Claimant was capable of performing medium level work. (*Id.*). The ALJ indicated that Dr. Humphries completed his examination on December 28, 2011, which was prior to the evaluations of the non-examining agency consultants. Therefore, implicit in the ALJ's rejection of Dr. Humphries's opinion was the ALJ's conclusion that medical evidence created **after** Dr. Humphries's examination corroborated Claimant's allegations of more severe physical functional limitations. Thus, rather than creating an RFC finding out of whole cloth, the ALJ carefully considered all of the medical source statements, but wisely viewed them in relation to the longitudinal medical evidence. As Claimant's medical documentation accumulated, providing more insight into his physical condition, the ALJ assessed the evidentiary value of the earlier opinions based upon their consistency with the other new substantial evidence. Then, considering the evidence in its entirety, the ALJ reached a conclusion concerning Claimant's RFC. Given that the RFC is "an administrative assessment" of the extent to which an individual's impairments and symptoms cause limitations that affect his or her capacity to do work-related activities, an ALJ is never required to adopt a particular medical source statement. SSR 96-8p, 1996

WL 374184, at *2, *7. The ALJ is only required to explain why a medical source opinion that conflicts with the RFC finding was not adopted. *Id.* at *7. Consequently, while the ALJ did not provide a perfect narrative discussion of the acceptable medical source opinions, he clearly stated that he did not adopt the exertional opinions of the non-examining consultants and Dr. Humphries because they were rendered before all of the relevant medical evidence was gathered; he ultimately accepted Dr. Ascue's opinions regarding the maximum weight that Claimant could lift and carry, and the amount of time he could sit, stand, and walk in an eight-hour day; but he rejected the more extreme limitations offered by Dr. Ascue as being contradicted by the evidence as a whole. As such, the undersigned **FINDS** that the ALJ's treatment of the acceptable medical source opinions relating to Claimant's physical RFC was appropriate, and his discussion of the opinions, while succinct, was sufficient for a subsequent reviewer to discern the rationale for the various weights the ALJ gave to the opinions.

Claimant next complains that the ALJ erred in assessing his credibility, essentially finding Claimant's allegations of pain to be false because he had no objective proof to support them. The undersigned disagrees. Although one factor relied upon by the ALJ in evaluating Claimant's credibility was the lack of medical evidence substantiating a physical source of Claimant's unrelenting pain, the ALJ complied with the applicable Social Security rules and regulations in performing the credibility analysis. The ALJ applied the proper two-step process, first determining that Claimant had medically determinable impairments that could reasonably be expected to cause pain. (Tr. at 25). Nonetheless, the ALJ did not believe Claimant to the extent that he alleged his pain was disabling. The ALJ examined the medical evidence, noting the lack of any treatment records documenting severe pain, or the symptoms associated with conditions causing

severe pain. Claimant's neurological tests were normal. His strength, grip, sensation, and gait were all normal. (*Id.*) Objective testing confirmed the presence of a mass at T8-T9, but treating specialists ruled out the mass as a cause of Claimant's pain, finding that the mass, which appeared to be a calcified ligamentum flavum, was not compressing on the spinal cord and did not appear to be growing. In addition to the routine findings in clinical records and on diagnostic tests, the ALJ reviewed Claimant's activities, indicating that Claimant had been able to work as a substitute teacher despite having panic attacks and PTSD. (Tr. at 26). He read, went to the library, helped with his son's wrestling team, visited with others, took walks, cooked, did laundry, shopped, and managed finances. The ALJ noted that even the medical source opinions, when taken as a whole, supported the conclusion that Claimant could tolerate sedentary exertional work. (*Id.*). Thus, the ALJ did consider evidence in the record other than the objective medical findings, and he did not doubt the veracity of Claimant's statements simply because no objective proof substantiated them. The ALJ had every right to consider the lack of medical findings and the conservative treatment received by Claimant as significant evidence undermining the reliability of his allegations of pain. Nevertheless, the undersigned notes that the ALJ ultimately gave substantial credence to Claimant's statements. Indeed, notwithstanding the absence of an objective physical source for Claimant's alleged severe pain, and in the face of evidence showing consistently normal examinations and unremarkable diagnostic test results, the ALJ nonetheless restricted Claimant to sedentary work. Consequently, the undersigned **FINDS** that the ALJ's credibility analysis was exceedingly fair to Claimant and does not provide a ground for remand.

Accordingly, after thoroughly examining the claimed errors related to the physical RFC, the undersigned **FINDS** that Claimant's allegations have no merit.

### C.  Errors Affecting the Mental RFC Finding

In contrast, the undersigned agrees with Claimant and **FINDS** that the ALJ erred in his determination of Claimant's mental RFC, including his treatment of Ms. Bishop's mental functional assessment. Claimant contends that the ALJ incorrectly disregarded Ms. Bishop's opinions because she was not a psychiatrist or psychologist and thereby denied Claimant the benefit of valuable evidence pertaining to his mental health impairments. Claimant also complains that the ALJ included a limitation in his RFC finding intended to account for the functional effects of Claimant's mental impairments, without providing any explanation for how the particular limitation achieved that purpose. Additionally, the ALJ made findings in the RFC related to Claimant's ability to respond appropriately to others and deal with work changes, but failed to cite to any evidence supporting those findings.

SSR 06-03p explains that opinions from medical sources who are not "acceptable medical sources" may not be used to establish the existence of a medically determinable impairment, but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*, 2006 WL 2329939, at *2. Furthermore, when explaining the consideration given to such other source opinions, the ALJ "generally should explain the weight given" to the opinions, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

Here, the ALJ's discussion of the evidence pertaining to Claimant's mental impairments and the ALJ's treatment of Ms. Bishop's opinions are so puzzling that the undersigned is effectively precluded from following the ALJ's reasoning. Starting at the

second step of the sequential process, the ALJ determined that Claimant had severe mental impairments of PTSD and anxiety disorder. (Tr. at 22). The ALJ never specified what evidence in the record (i.e. which acceptable medical source and what medically acceptable clinical and laboratory diagnostic data) provided the foundation of these medically determinable impairments; although, at step three of the process, he mentioned records provided by Ms. Bishop and a treating psychologist—likely referencing Dr. Steward, Ms. Bishop's supervising psychologist.[5] Of note, the ALJ gave no other attention in his written decision to Dr. Steward, nor did the ALJ in any other circumstance weigh Ms. Bishop's opinions while taking into consideration Dr. Steward's supervisory involvement.

Using these same records, the ALJ concluded that Claimant had mild restrictions in activities of daily living and social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 23-24). However, the ALJ's analysis of the records, which follows his findings, contains several significant inaccuracies. First, the ALJ discussed the results of mental status examinations, which he represented as "reflect[ing] that the claimant has the mental functional ability to perform at least unskilled job tasks with the ability to understand and remember simple instructions." (Tr. at 24). Yet, a review of the record reveals that Ms. Bishop produced only summaries of her evaluations and treatment, rather than the notes of her sessions with Claimant. Accordingly, mental status examinations were not documented in the

---

[5] Ms. Bishop was a Licensed Professional Counselor and a Masters level psychologist, who was being supervised by Dr. Steward, a Licensed Psychologist. Under West Virginia law, a Masters level psychologist must be supervised for five years before he/she is eligible to be licensed. W.Va. Code § 30-21-7(a)(4). Given that Ms. Bishop was not yet a licensed psychologist, she was not an "acceptable medical source" under Social Security regulations. 20 C.F.R. §§ 404.1501, 416.902. However, she was an "other medical source." SSR 06-o3P, 2006 WL 2329939.

exhibits referenced by the ALJ, nor anywhere else in the record for that matter. Consequently, the evidentiary basis for the ALJ's statement is unknown. In addition, the ALJ indicated that although Claimant had moderate problems with concentration, persistence, or pace, he did not have any "cognitive deficits or other such problems." (*Id.*). Again, the ALJ made no reference to an evidentiary source for that conclusion, and the record does not appear to contain any testing for cognitive deficits. Finally, without identifiable corroboration in the record, the ALJ stated that "[m]ental health treatment records indicate the claimant has responded well to treatment." (Tr. at 24). To the contrary, the summaries supplied by Ms. Bishop provide scant information regarding Claimant's progress in therapy. Her October 9, 2013 report, at best, suggested that Claimant's condition was stable, but he continued to have regular panic attacks and symptoms of depression. (Tr. at 373-74). Her March 5, 2014 report, which was supplied to the Appeals Council, explicitly stated: "[i]t is my opinion that while [Claimant] has made some progress is [*sic*] therapy sessions over the duration of his treatment, his ability to maintain consistent functioning in daily activities has deteriorated." (Tr. at 402). These documents plainly contradict the ALJ's representation of the evidence.

At the third step of the process, the ALJ provided several reasons for giving "very little weight" to Ms. Bishop's opinions expressed in an October 9, 2013 mental capacity assessment. (Tr. at 27). First, the ALJ indicated that Ms. Bishop was "not a psychiatric [*sic*] or psychologist." (*Id.*). This is plainly an invalid reason for discounting Ms. Bishop's opinion. Contrary to the ALJ's statement, Ms. Bishop was a psychologist. While she had not yet qualified for West Virginia licensure, Ms. Bishop had obtained a Master of Science Degree in psychology or a similar field, was a licensed counselor, and was recognized as a "supervised psychologist" acting under the auspices of a licensed psychologist. Therefore,

although the ALJ could have properly rejected Ms. Bishop's opinions on the existence of a medically determinable impairment, her opinions on Claimant's mental functional capacity should not have been rejected on that ground. *See* SSR 06-03P, 2006 WL 2329939, at *4-*5. Indeed, when weighing the RFC opinions of medical sources who are not "acceptable medical sources," the ALJ should consider whether the source has an area of expertise related to the claimant's impairment. *Id.* at *4. In this case, Ms. Bishop's training and specialty should have been viewed as a factor weighing in favor of her opinions, not as a reason to discount them.

Second, the ALJ indicated that Ms. Bishop's opinions were "inconsistent" with her treatment records. (Tr. at 27). However, as Claimant emphasized, no treatment records were produced. Ms. Bishop supplied the reports of two psychological evaluations and two broad summaries concerning twenty-five counseling sessions, but no reports of the actual sessions. Moreover, as Claimant points out, the ALJ provided no specifics regarding how Ms. Bishop's opinions were inconsistent with the records she provided to the ALJ. Clearly, the records do not paint such a blissful picture of Claimant's mental health that it is apparent on the face of the documents which of Ms. Bishop's notations contradict her function-by-function assessments. Accordingly, the ALJ is obligated to identify what findings in the summaries conflict with which severity ratings. The ALJ also found that Ms. Bishop's opinions were inconsistent with the GAF score of 65, which she assigned to Claimant in his two psychological evaluations. Certainly, a GAF score of 65 is inconsistent with a finding of disabling psychological symptoms; nevertheless, a GAF score, which is the clinician's subjective assessment of how well her patient is functioning at a given point in time, is nothing more than a tool to help the clinician make treatment decisions. *Powell v. Astrue*, 927 F. Supp. 2d 267, 273 (W.D.N.C. 2013). "'A GAF score is thus not dispositive

of anything in and of itself" and has no direct legal or medical correlation to the severity requirements of social security regulations." *Id.* Moreover, the GAF scores were assigned in November 2010 and March 2012, well before Ms. Bishop completed the RFC assessment in October 2013.

Lastly, the ALJ discounted Ms. Bishop's opinions because (1) they were inconsistent with Claimant's activities "reported to her in March 2012" and (2) Ms. Bishop referenced Claimant's chronic pain as an explanation for the reported limitations. (Tr. at 27). Once again, the ALJ failed to explain which of Ms. Bishop's detailed opinions were called into question by which of Claimant's reported activities, leaving the Court to speculate as to the purported discrepancies. Furthermore, the ALJ made no mention of the October 9, 2013 treatment summary provided concurrently with Ms. Bishop's report in which she stated that Claimant continued to have difficulty coping with panic attacks, which occurred on average between two to four times per month, and that he was now taking both an anti-anxiety medication and an anti-depressant. Although this treatment summary was chronologically more relevant to Ms. Bishop's opinions than the March 2012 psychological evaluation, the ALJ failed to discuss the summary or compare its findings to those on the mental capacity assessment. The ALJ also failed to address the comments included on the Mental RFC form, itself, to determine if Ms. Bishop's more recent observations and findings were actually supportive of the degree of limitation indicated on the form.

Similarly, the ALJ provides no rationale for why Ms. Bishop's opinions should merit little weight simply because they include Claimant's purported chronic pain as a factor affecting his mental health. Ms. Bishop opined that Claimant's chronic pain contributed to his irritability and depression, affected his sleep and energy level, and

exacerbated his mental functional limitations. Given that the ALJ restricted Claimant to sedentary work largely due to his musculoskeletal pain, it is not inconceivable that Claimant's pain would affect his state of mind and, consequently, his ability to function appropriately psychologically. Accordingly, this ground for discounting Ms. Bishop's opinions is bewildering.

Obviously, in the course of reconsidering the opinions of Ms. Bishop, the ALJ should also re-examine the mental restrictions included in the RFC finding. The ALJ restricted Claimant to "no more than short simple instructions" on the basis that he was "at least capable of understanding, carrying out, and remembering simple instructions and tasks consistent with unskilled work." (Tr. at 24, 27). The written decision is silent as to whether this restriction was intended to account for Claimant's moderate difficulties in maintaining concentration, persistence, or pace. The ALJ also explicitly found that Claimant was "able to respond appropriately to supervisors, others, and to deal with routine work changes" without reference to specific evidence or further explanation.  (Tr. at 24).

Ms. Bishop opined that Claimant had only slight limitations in his ability to understand and remember very short and simple instructions and no limitations in his ability to carry them out. (Tr. at 377). However, Ms. Bishop also felt that Claimant had moderate limitations of his ability to maintain attention and concentration for extended periods of time, and of his ability to perform activities within a schedule. (*Id.*). She believed that Claimant was markedly impaired in his ability to work in coordination with or in proximity to others without being distracted and work at a consistent pace, and was moderately limited in his ability to make simple work-related decisions, respond appropriate to changes at work, and complete a normal workday without interruptions

from psychologically based symptoms.

In *Mascio v. Colvin*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") considered whether an RFC finding that effectively limited a claimant to unskilled work adequately addressed her mental limitations. *Id.,* 780 F.3d 632, 637 (4th Cir. 2015). In *Mascio,* the ALJ determined at step three of the disability process that the claimant experienced moderate difficulties in maintaining concentration, persistence, or pace; however, the ALJ failed to include any mental limitations in the controlling hypothetical question presented to the vocational expert. 780 F.3d at 637-38. While the vocational expert supplied a list of jobs that were all unskilled, the Fourth Circuit found that this was insufficient to account for the claimant's moderate mental limitations, noting "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Fourth Circuit explained that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."[6] *Id.* Because the ALJ failed to either include any mental limitation in the RFC or explain why a "moderate limitation in concentration, persistence, or pace at step three d[id] not translate into a limitation" in the ALJ's RFC finding, the Fourth Circuit found that remand was appropriate. *Id.*

The same issue was recently addressed by this Court in *Jackson v. Colvin*, No. 3:14-cv-24834, 2015 WL 5786802, at *4-*5 (S.D.W.Va. Sept. 30, 2015). There, the ALJ found

---

[6] Listing 12.00 explains that "[c]oncentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3).

that the claimant experienced moderate deficiencies in concentration, persistence, or pace. *Id.* at *1. Attempting to take this limitation into account, the ALJ restricted the claimant to work involving simple tasks and instructions; however, the Court recognized that this was inadequate under *Mascio,* stating: "[i]f the ALJ found [the claimant] had moderate mental limitations related to concentration, persistence, or pace—which here the ALJ found—the ALJ should have either included those limitations in the hypothetical or explained in the RFC assessment why, despite finding these moderate mental limitations, it was unnecessary to include them in the hypothetical. Failure to do so requires remand." *Id.* at *4 The Court found that remand was appropriate because the ALJ did neither.[7] *Id.* at *5. In view of the ALJ's finding in this case that Claimant had moderate limitations in concentration, persistence, and pace, limiting him to work involving short, simple instructions without further explanation was insufficient under the principle espoused by the Fourth Circuit in *Mascio* and should be addressed on remand.

In addition, the ALJ should determine the propriety of his findings regarding Claimant's ability to respond appropriately to others and to routine work changes in light of Ms. Bishop's opinions. The ability to "respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting" are "basic mental demands of competitive, remunerative, unskilled work." SSR 85-15. 1985 WL 56857, at *4 (S.S.A. 1985). A substantial loss of the ability to meet these basic work-related activities "would severely limit the potential occupational base." *Id.* Therefore, in order to

---

[7] The Court noted that "what was pivotal in *Mascio* was not the claims or evidence presented in the agency proceeding, but the ALJ's finding [of moderate difficulties in concentration, persistence, or pace]." *Jackson*, 2015 WL 5786802, at *4.

insure that the step five finding is accurate, the ALJ must fully address and properly address and reconcile the unresolved issues pertaining to Claimant's mental RFC.

### D.  Error Related to Step Five

Claimant argues that the ALJ's decision denying benefits was flawed because he based the decision on an incorrect application of the Grids. (ECF No. 12 at 1-2). Claimant contends that his combination of exertional and nonexertional impairments precluded the ALJ from using the Grids to direct a finding of nondisability. In view of the above-described errors in Claimant's mental RFC assessment, the undersigned **FINDS** that the ALJ's application of the Grids was improper.

Once a claimant has proven that he is unable to perform past relevant work, the burden shifts to the Commissioner to show that the claimant can perform other work available in the national economy. This burden can be met in one of two ways. First, when the claimant has no significant nonexertional impairments and can perform a full range of work at a particular exertional level, the ALJ can apply the Grids to show that the claimant is not disabled. The Grids "contain numbered table rules which direct conclusions of 'disabled' or 'not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83-12, 1983 WL 31253, at *1; *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The Grids are intended to be utilized at the fifth step of the sequential process, for "cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work." 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 200.00. Thus, in determining whether there are jobs that exist in significant numbers in the national economy, the ALJ may rely upon the

48

Grids "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); s*ee also* 20 C.F.R. §§ 404.1569, 416.969.

However, when a claimant has significant nonexertional impairments, the Grids often do not provide adequate information for the ALJ to complete the disability analysis. 20 C.F.R. §§ 404.1569, 416.969. In this circumstance, the Commissioner meets her burden through the testimony of a vocational expert. Generally, when a claimant has significant nonexertional impairments, or has a combination of exertional and nonexertional impairments, the Grids can provide only a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In these cases, the ALJ begins the step five process by consulting the Grids to determine whether a rule directs a finding of disability based on the strength requirement alone. If a rule so directs, then there is no need to assess the effects of the nonexertional limitations.

If, on the other hand, the Grids direct a finding of "not disabled" based on the strength requirement alone, the ALJ usually cannot rely on that finding and, instead, must establish the availability of jobs through the testimony of a vocational expert. *Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989). An exception to this requirement applies when the particular nonexertional limitations have very little effect on the range of work available in the occupational base of the relevant exertional level. SSR 83-14, 1983 WL 31254, at *3-4 (S.S.A. 1983). In other words, when a claimant's combined exertional and nonexertional impairments allow him to perform many of the occupations classified at a particular exertional level, but not all of them, the occupational

49

base at that exertional level will be reduced to the extent that the claimant's restrictions and limitations prevent him from doing the full range of work contemplated by the exertional level. *Id.* If the reduction in the occupational base is negligible, then the ALJ can rely on a Grid rule to direct a finding of nondisability. In contrast, if the effect on the occupational base is substantial, or is not readily discernible, "the ALJ generally must accept evidence from a vocational expert, who, based on the claimant's age, education, work experience, and RFC, testifies whether there are jobs for such a person in the national economy." *Morgan v. Barnhart*, 142 F. App'x 716, 720-21 (4th Cir. 2005); SSR 83-14, 1983 WL 31254, at *6.

In this case, the ALJ retained the services of a vocational expert, who testified at the hearing. The expert was asked a series of questions based upon the Claimant's RFC finding to determine what effect limitations on stooping, crouching, kneeling, and climbing would have on the light and sedentary occupational base. (Tr. at 61). The vocational expert responded that stooping and bending restrictions would significantly limit the light level occupational base, but indicated that jobs would still be available at that level even with bending and stooping deficits. The vocational expert was then asked if an individual limited to no more than short, simple instructions would be able to do unskilled work at the light and sedentary exertional levels. The vocational expert agreed that such a restriction would not preclude unskilled work. (*Id.*). However, when asked if unskilled work would be excluded if the individual had difficulty working without being distracted by others, and had trouble completing a normal work week without being interrupted by psychological symptoms, the vocational expert testified that these nonexertional impairments would have a substantial impact on the individual's ability to do unskilled work. (Tr. at 63). The ALJ did not pose hypothetical questions to the

vocational expert that actually incorporated Claimant's RFC finding, and he elicited no testimony from the vocational expert regarding what jobs were available in the national economy that could be performed by an individual with Claimant's particular combination of functional limitations. Instead, the ALJ concluded that Claimant could do a full range of sedentary work with a restriction to jobs involving only short, simple instructions, which, according to the vocational expert, included unskilled work. Implicitly determining that Claimant's nonexertional limitation did not affect the sedentary occupational base, the ALJ relied on the Grids to direct a finding of nondisability.

The ALJ's use of the Grids and his nondisability determination arguably would not have been erroneous if his RFC finding were correct. *See Livingston v. Colvin*, No. 3:13-CV-00233-MOC, 2014 WL 496484, at *6 (W.D.N.C. Feb. 6, 2014) (A limitation to short routine repetitive tasks does not prevent an ALJ from relying on the Grids); *Williams v. Astrue*, No. 2:09CV60, 2010 WL 395631, at *18 (E.D. Va. Feb. 2, 2010) (finding that limitation to simple instructions and simple tasks did not have a significant effect on occupational base, so ALJ was able to use Grids); *and* SSR 96-6p, 1996 WL 374185 (S.S.A. 1996) (ability to understand, remember, and carry out simple instructions is consistent with the unskilled sedentary occupational base). However, considering the errors made in Claimant's mental RFC assessment, and the effect a revised RFC finding might have on the occupational base applicable to Claimant, the ALJ's use of the Grids at step five of the proceedings must be reevaluated on remand. *See Sherby v. Astrue,* No. 2:09–cv–1061–PMD, 767 F.Supp.2d 592, 598 (D.S.C. 2010) (holding that "a concentration deficiency caused by pain ... falls in between the examples cited in SSR 83–14, thus requiring the assistance of a vocational expert."); *and Bowman v. Colvin*, No. 3:12-CV-03589-DCN,

51

2014 WL 1155405, at *5-6 (D.S.C. Mar. 21, 2014) (finding that the ALJ's "restriction prohibiting the claimant from performing skilled work did not adequately prove that the Commissioner met [her] burden of establishing that the claimant's concentration deficiency had little or no effect on the occupational base of unskilled, light work.")

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's Brief in Support of Complaint to the extent that it seeks reversal and remand of the Commissioner's decision (ECF No. 10); **DENY** Defendant's Brief in Support of the Defendant's Decision (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to properly assess the opinions of Ms. Bishop, re-evaluate Claimant's mental RFC finding taking into account the assessment of Ms. Bishop's opinions and any other relevant evidence, and re-evaluate the ALJ's use of the Grids at step five of the disability process; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and

Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  April 4, 2016

Cheryl A. Eifert
United States Magistrate Judge